**UNITED STATES of America ex rel. David ALMEIDA**

v.

**Alfred T. RUNDLE, Warden State Correctional Institution, Philadelphia, Pennsylvania.**

Misc. No. M-2677.

United States District Court
E. D. Pennsylvania.

June 28, 1966.

Jerome J. Shestack, Herbert Keene, Philadelphia, Pa., for relator.

John F. Hassett, Philadelphia, Pa., for respondent.

## OPINION

HIGGINBOTHAM, District Judge.

Relator, David Almeida, seeks a writ of habeas corpus alleging violation of his rights under the Fourteenth Amendment to the United States Constitution. The substance of his allegations for which relief is requested may be categorized as follows: (1) that the act for which he was convicted was not a crime when it was committed and that as a consequence his conviction violates the ex post facto and due process clauses of the Constitution; (2) that the statute under which he was convicted was unconstitutionally vague; (3) that his continued incarceration constitutes a denial of the equal protection of the laws in light of the decision of the Supreme Court of Pennsylvania in Commonwealth v. Redline, 391 Pa. 486,

137 A.2d 472; (4) that he was placed in double jeopardy when he was tried a second time; and (5) that because of an alleged "suppression" of evidence from the grand jury the indictment rendered by that body on April 1, 1947 was null and void.

After consideration of the oral arguments and a careful review of all of the records and briefs, I am confident that relator's claims do not rise to the level of federal constitutional deprivations and thus his request for relief must be denied and the petition dismissed with prejudice.

On January 30, 1947, the relator and two others perpetrated an armed robbery of a super market in Philadelphia. Almeida was armed with a .45 caliber pistol as was his partner Hough. The third partner, Smith, was armed with a .22 caliber pistol. As the relator and his partners attempted to flee the scene of the crime, a gun battle ensued between themselves and the police during the course of which, an off-duty policeman (Officer Ingling), who by coincidence was present at the scene, was shot and killed.

The Assistant District Attorney in charge of the relator's prosecution knew, when presenting the matter to the grand jury, that a .38 caliber blood-stained bullet had been found near the slain officer's body. The Assistant District Attorney also knew that the ballistic experts had reported that this blood-stained bullet was of a different caliber than the guns used by the felons. The Supreme Court of Pennsylvania concluded the following from this data:

> It *appears* from the factual background of the case that the victim's death resulted not from a bullet fired by Almeida or one of his co-felons, but rather from a bullet fired from the gun of a fellow policeman of the deceased, who assisted on the scene in attempting to apprehend the criminals. Commonwealth ex rel Almeida v. Rundle, 409 Pa. 460, 187 A.2d 266, 267. (Emphasis added.)

There was evidence which indicated that the wound suffered by Officer Ingling was too small to have been caused by a bullet from any of the weapons of the felons.

On the issue of who fired the fatal bullet, the Assistant District Attorney presented to the grand jury only the testimony of the victim's widow and one of Almeida's co-felons who testified that Almeida had fired the fatal bullet. The evidence of the blood-stained bullet was never brought to the grand jury's attention, nor indeed to the first trial court. The relator was indicted for murder in the first degree and was tried and convicted in June of 1948. In accordance with the jury's findings Almeida was sentenced to death.

Several weeks after his conviction, one of the relator's co-felons was brought to trial. At that trial, evidence was introduced, for the first time, pointing to the existence of the blood-stained .38 caliber bullet.

The relator appealed his conviction to the Pennsylvania Supreme Court which was presented with the evidence not made available at his trial. That court after considering the possibility that neither the relator nor his confederates fired the fatal shot held that even if this were proven to be the case, the relator was rightly convicted of first degree murder, and therefore affirmed his sentence. Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183 (1949), cert. denied 339 U.S. 924, 70 S.Ct. 614, 94 L.Ed. 1346; rehearing denied 339 U.S. 950, 70 S.Ct. 798, 94 L.Ed. 1364 (1950). Thereafter, Almeida instituted habeas corpus proceedings in the United States District Court for the Eastern District of Pennsylvania alleging that the Commonwealth had deliberately suppressed evidence at his trial. A hearing was held before Judge George A. Welsh who granted the relator a writ of habeas corpus. United States ex rel. Almeida v. Baldi, 104 F.Supp. 321 (E.D.Pa.1951).

On appeal by the Commonwealth, the Court of Appeals for the Third Circuit affirmed the District Court. The Court held that since under Pennsylvania law the jury decides whether the penalty will

be life imprisonment or death, "who killed Ingling was a relevant issue, as to penalty to be imposed by the jury at the trial, perhaps the most relevant one." Thus the Court held that the "deliberate suppression by the Commonwealth of Pennsylvania of evidence vital to the defense in the trial of a capital case is such a violation of due process as to vitiate those proceedings." 195 F.2d 815, 816, 819, 33 A.L.R.2d 1407. The Court did not address itself to the possible suppression of evidence before the grand jury, and in fact it does not appear that this issue was ever raised. It concluded by noting that "[t]he grant of the writ will not keep Almeida from being tried again for he cannot successfully plead double jeopardy." 195 F.2d 815, 825, n. 30.

The relator was again brought to trial on the same indictment; he entered a plea of guilty and was sentenced to life imprisonment. While confined in the state correctional institution, he filed a petition in the state courts seeking a writ of habeas corpus. The petition was denied without a hearing and on appeal the Supreme Court of Pennsylvania affirmed. Commonwealth ex rel. Almeida v. Rundle, 409 Pa. 460, 187 A.2d 266 (1963).

The United States Supreme Court denied certiorari.[1]

Having exhausted all of the state remedies available to him, the relator filed a petition for a writ of habeas corpus in this court. On May 1, 1964, Judge Abraham L. Freedman issued a memorandum order in which he noted that the constitutional claims raised by the relator were of sufficient interest and significance to be presented to this court on his behalf. Judge Freedman specified four constitutional questions which were expressly or impliedly raised by the petition and invited counsel to raise any other issue which in his judgment inhered in the petition.

Prior to the filing of briefs and the presentation or arguments, Judge Freedman was appointed to the Court of Appeals and the matter was subsequenty assigned to me.[2]

By reason of the questions which Judge Freedman posed [3] and the exhaustive research and briefs filed in behalf of the relator, it will be necessary throughout some portions of this opinion to consider alternative arguments made by relator. Some of these alternative arguments require the court to assume *arguendo* cer-

---

1. Of course I have not attempted to narrate all of the facts in this litigation which began, after all, in 1947. For a complete summary of the facts and chronology of this case see Judge Welsh's excellent opinion at 104 F.Supp. 321 (E.D.Pa., 1951.)

2. When this matter was reassigned to me no briefs had been filed by any of the parties nor had hearings been held. Since its assignment there have been two extensive arguments and the taking of testimony in support of relator's contentions. The District Attorney's final brief was not filed until February 17, 1966.

3. Judge Freedman's order provided for argument on the following issues:
 "1. Was the relator deprived of liberty without due process of law despite his plea of guilty because the Commonwealth obtained the indictment by the knowing and willful suppression of evidence showing who had fired the fatal shot?
 "2. Was the application to relator of the rule of Commonwealth v. Moyer,

357 Pa. 181 [53 A.2d 736] (1947) and Commonwealth v. Almeida, 362 Pa. 596 [68 A.2d 595, 12 A.L.R.2d 183] (1949), developed subsequent to the homicide for which the relator was charged with murder, a violation of the provisions of Article 1, § 10, of the Constitution of the United States, prohibiting any State from passing an ex post facto law?
 "3. Was the determination of what constituted murder under the Pennsylvania Act of June 24, 1939, P.L. 872, § 701, 18 P.S. § 4701, as applied to relator's case, based upon laws too vague and indefinite to support his conviction and therefore a deprivation of his liberty without due process of law?
 "4. Does the relator's sentence to life imprisonment for murder amount to a denial of the equal protection of the laws since the decision by the Supreme Court of Pennsylvania in Commonwealth v. Redline, 391 Pa. 486 [137 A.2d 472] (1958)?"

tain intermediate premises which have been rejected by my holdings. Thus, I have had the choice of either writing an opinion which may become too extensive by answering these alternative arguments or *not* considering any alternative arguments which are inconsistent with any of my holdings.

This problem is presented most dramatically in the relator's contention that his conviction should be reversed because it violates the ex post facto and due process clauses of the United States Constitution. Since, as noted in Part I of this opinion, I find that relator's acts constituted murder as of the time he committed them, his conviction by definition could not be violative of the ex post facto clause or the due process clause as it pertains to prohibiting retroactivity. Nevertheless I will analyze relator's argument (in Part II) and assume arguendo relator's ex post facto premise that the acts were not murder when committed, and thus under such an assumption, I am required to analyze whether the constitutional clauses in issue are applicable. I have made detailed alternative findings and holdings so that hopefully this matter may be terminated in one way or the other upon review; thus any appellate court which may disagree with my "preliminary" holdings will have the opportunity to know what my rulings would be on the alternative arguments. In this way, perhaps the possibility of a remand could be diminished and this protracted matter can finally come to an end upon appellate review.

## I.

### PENNSYLVANIA LAW OF MURDER IN THE FIRST DEGREE

█ Relator claims that his " * * * conviction for an act which was not a crime when committed was a violation of his constitutional rights." Thus *ab initio*, we must attempt to ascertain whether by Pennsylvania law his acts of January 30, 1947, constituted first degree murder. The United States Supreme Court has often emphasized that:

> We usually walk on *treacherous ground when we explore state law, for state courts*, state agencies, and state legislatures *are its final expositors under our federal regime.* Brady v. State of Maryland, 373 U.S. 83, 90, 83 S.Ct. 1194, 1198, 10 L.Ed.2d 215 (1963).

(Emphasis added.)

In the instant case, an analysis of the Pennsylvania first degree murder statute exposes one to grounds which are probably even more treacherous than usual, because over a period of years the Pennsylvania Supreme Court has announced conflicting principles through different opinion writers: In Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183 (1949) Chief Justice Maxey, writing for the majority, said that the court was stating what allegedly had been "the *long established*" Pennsylvania law of murder in the first degree 362 Pa. 596 at 603, 68 A.2d 595; nine years later, in Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472, Chief Justice Jones, who had dissented in *Almeida,* supra, said the "long established" principle as announced in Almeida had actually been a "*radical departure* from common law criminal jurisprudence." 137 A.2d 472 at p. 473 (emphasis added.)

The statute under which Almeida was convicted reads as follows:

> MURDER OF THE FIRST AND SECOND DEGREE: All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed *in the perpetration of,* or attempting to perpetrate any arson, rape, *robbery*, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree. 18 P.S. §

4701, Act of June 24, 1939, P.L. 872, § 701; 1959, Dec. 1 P.L. 1621 § 1.[4]

If one frames the issue putting the facts in a light most favorable to relator, the pivotal question in construing the Pennsylvania statute becomes:. Has a felon committed murder in the first degree if an innocent third party was killed by the shots of a police officer who was attempting to prevent the felons from escaping the scene of the crime?

Alternatively, the issue could be phrased: Does the felony murder rule encompass a situation when an innocent third party is killed by a shot fired by someone other than the felon or his confederates? ·

## A.

Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183 (1949):

At Almeida's original trial, his counsel clearly raised the issue in their 13th point for charge, by requesting the trial judge to instruct the jury "that in order to convict the defendant of the death of Officer Ingling, the jury would have to find that the fatal shot was *fired by one of the three robbers.*"

On appeal, the Supreme Court of Pennsylvania stated that "[s]uch an instruction would have been in defiance of this court's decision in Commonwealth v. Moyer and Commonwealth v. Byron, 357 Pa. 181, 53 A.2d 736, 741, which decision the trial judge dutifully followed. In that decision handed down on June 30, 1947, this court held in an opinion concurred in by the six judges who heard the argument on appeal, that: 'A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons. * * *'" Commonwealth v. Almeida, supra, 68 A.2d 595, at pp. 598–599.

The Supreme Court went on to say "Our decision in the Moyer-Byron case was an application of the *long established* principle that he whose felonious act is the proximate cause of another's death is criminally responsible for that death and must answer to society for it exactly as he who is negligently the proximate cause of another's death is civilly responsible for that death and must answer in damages for it. * * * These principles apply to both crimes and torts. * * * Courts in the United States, England and Canada have applied the foregoing principles of 'proximate cause' in murder cases, as the cases now to be cited and reviewed in this opinion demonstrate. * * * [w]hether the fatal bullet was fired by one of the bandits or by one of the policemen who were performing their duty in repelling the bandit's assault in defending themselves and in endeavoring to prevent the escape of the felons is immaterial. Whoever fired the fatal shot, the killing of Officer Ingling had its genesis in the robbing by the defendant and his confederates of the Acme Market, and in their firing upon the police officers who in the performance of their duty were attempting to take them into custody." 68 A.2d 595 at pp. 599–600, 601, 602–603. (Emphasis added.)

Thus, the 1949 *Almeida* opinion held that it had been the "long established principle" in Pennsylvania (thus including the time when Almeida committed the acts in issue) that the felony murder rule

---

4. The historical note to the murder statute reads as follows:

Penal Code 1939:

This section is a consolidation of the provisions of sections 74–76 of act 1860, March 31, P.L. 382, as amended and reads substantially the same, except that instead of the positive statement under the circumstances related the crime is murder in the first or second degree, it was provided that the offense should be "deemed" murder in the first or second degree, and with the further exception that, in the last paragraph, the provision authorizing a fine in the alternative or both fine and imprisonment was added.

For the general history of the Pennsylvania Murder Statute see: Keedy, History of the Pennsylvania Statute Creating Degrees of Murder. 97 U. of Pa.L.Rev. 759.

was applicable if in the commission of a robbery an innocent third party was killed by a shot fired by someone other than the felon. In the 1949 Almeida case, Justice Charles Alvin Jones filed the only dissent.

### B.

### Commonwealth v. Moyer, Commonwealth v. Byron, 357 Pa. 181, 53 A.2d 736 (1947)

Commonwealth v. Almeida cannot be understood without a full exposition of the facts announced in the earlier decisions of Commonwealth v. Moyer and Commonwealth v. Byron. Moyer and Byron, on the night of July 13, 1946, were engaged in a robbery of a gas station in Delaware County. During the course of the robbery, shots were exchanged between the owner of the station, Earl Shank, and the robbers, Moyer and Byron. As a result of the shooting an employee of Shank was killed. Moyer and Byron were convicted of his murder. The second assignment of error when the matter was argued before the Pennsylvania Supreme Court, was based on an excerpt from the charge of the trial court in which the jury was instructed that "[a]ll of the participants in an attempted robbery are guilty of murder in the first degree *if someone* is killed in the course of the perpetration of the first named crime. That is the law of the Commonwealth of Pennsylvania." 357 Pa. 181 at p. 188, 53 A.2d 736 at p. 740. The defendants had challenged the Court's instruction and said that the issue in the case was "whether or not the decedent met his death by a wound inflicted by the defendant Moyer or by the garage owner Shank." 357 Pa. 181 at p. 188, 53 A.2d 736 at p. 740. The Supreme Court noted that "[t]his assignment of error poses a question whether or not these defendants can legally be convicted of murder if the bullet which killed Zerbe (the innocent victim) came from the revolver fired by

the latter's employer in an attempt by him to frustrate the attempted robbery. We have no doubt that even under these facts, which facts the Commonwealth does not concede, the complained of conviction was proper. A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired *not by the felon* but by the intended victim in repelling the aggressions of the felon or felons. This is a question which apparently has never before arisen in this Commonwealth and has arisen elsewhere only rarely." 357 Pa. 181, 188, 189, 53 A.2d 736, 740. (Emphasis added.)

Thus, in *Moyer, supra, a crime which occurred more than six months before Almeida's crime occurred*, a trial court held that under Pennsylvania law the participants in an attempted robbery are guilty of murder in the first degree "if someone is killed" in the course of its perpetration of the attempted robbery.

This instruction was affirmed by the Supreme Court of Pennsylvania on June 30, 1947, with that Court noting that in legal effect it was irrelevant whether the shot was fired by the felon, or by the intended victim in an attempt to repel the aggression of the felon or felons. The instruction in issue was given by Judge A. B. McDade of Delaware County on January 7, or 8, 1947, more than three weeks before Almeida was engaged in the armed robbery of January 30, 1947.[5]

### C.

### Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (1958)

Nine years after the first Almeida opinion the Pennsylvania Supreme Court was presented with a new doctrinal problem. In Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (1958), "[t]he defendant was convicted of murder in the first degree with penalty fixed at life im-

5. I have personally examined the record filed with the Supreme Court of Pennsylvania in the Moyer case. Page two of the defendant's brief notes that "the defendants were jointly tried before the Honorable A. B. McDade, Judge, on January 6, 7 and 8, 1947."

prisonment for the death of his *co-felon* from a gunshot wound inflicted by a police officer endeavoring to apprehend the two culprits who were attempting to flee the scene of their armed robbery." On its facts *Redline* is distinguishable from *Almeida* in that the person killed was not an innocent victim, as was Officer Ingling, but instead was one of the felons perpetrating the armed robbery. The *Redline* case is relevant in that the 1958 Supreme Court of Pennsylvania said of the first Almeida opinion, that: "The decision in the Almeida case was a radical departure from common law criminal jurisprudence; and the ruling should not be extended by still further judicial enlargement." (137 A.2d 472, 473.) In *Redline,* the Court said: "And so, until the decision of this court in Commonwealth v. Almeida, supra, in 1949, the rule which was uniformly followed, whether by express statement or by implication, was that in order to convict for felony-murder, the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking. * * * Until the Almeida case there was no reported instance in this State of a jury ever having been instructed on the trial of an indictment for murder for a killing occurring contemporaneously with the perpetration of a felony that the defendant was guilty of murder regardless of the fact that the fatal shot was fired by a third person acting in hostility and resistance to the felon and in deliberate opposition to the success of the felon's criminal undertaking." (137 A.2d 472, 476, 477.)

In *Redline,* the Court partially repudiated the proximate cause theory announced by the Court in Almeida. The Court noted that it was afforded "an appropriate occasion for the repudiation of Commonwealth v. Thomas, supra [382 Pa. 639, 117 A.2d 204] which we now expressly overrule as an unwarranted judicial extension of the felony-murder rule." (137 A.2d 472, 482.) It said that "Almeida was, itself, an extension of the felony-murder doctrine by judicial deci-

sion and is not to be extended in its application beyond facts such as those to which it was applied." (137 A.2d 472, 482.) The Court noted the factual difference in *Redline*—a felon being killed there, and an innocent victim in Almeida —and concluded that "[t]he limitation which we thus place on the decision in the Almeida case renders unnecessary any present reconsideration of the extended holding in that case. It will be time enough for action in such regard if and when a conviction for murder based on facts similar to those presented by the Almeida case (both as to the performer of the lethal act and the status of its victim) should again come before this court." (137 A.2d 472, 483.) As a result, the Court granted Redline a motion in arrest of judgment. In *Redline,* Justice Bell dissented. Justice Cohen concurred in the reasoning and result of the majority opinion but believed that the majority "did not go far enough" in that it should have also overruled the Court's decisions in Commonwealth v. Almeida.

#### D.

#### Commonwealth ex rel Almeida v. Rundle 409 Pa. 460, 187 A.2d 266 (1963)

Five years after *Redline,* supra, Almeida's appeal from the denial of the writ of habeas corpus by a lower court was decided by the Pennsylvania Supreme Court. The Pennsylvania Supreme Court in a unanimous opinion held that "[w]hen Almeida was convicted of the crime involved, the law of this Commonwealth was that where, in the commission of a felony, such as robbery, a third person is killed by one resisting the felon or who is endeavoring to prevent his escape from the scene of the crime, the felon is guilty of murder in the first degree." (187 A.2d 266, p. 267.) The Court noted that there was " * * * a very significant change in the concept of the rule of felony murder was enunciated" in Commonwealth v. Redline and that although Commonwealth v. Almeida "was not specifically overruled, the law of the case was limited to its own factual situation." (187 A.2d 266, 267.)

■ In summary, I am aware that there are persuasive arguments made by commentators and indeed some Pennsylvania Supreme Court Justices that the Pennsylvania murder statute did not encompass the factual situation involving Almeida. Nevertheless, my responsibility is not to sit as a super appellate court reviewing the "correctness" of decisions of the Pennsylvania Courts as to what Pennsylvania law is; rather my obligation is to ascertain how they have defined Pennsylvania law, and then to evaluate that state law to determine whether it infringed any federal constitutional rights of the relator. Thus, despite the dissent of Justice, then later Chief Justice Charles Alvin Jones, and the comments by the majority in *Redline*, I find that the Pennsylvania law as of January 30, 1947 when the shooting in issue took place, was that one was guilty of first degree murder where in the commission of a felony such as robbery, a third person is killed by one resisting the felon or by one who is endeavoring to prevent the felon's escape from the scene of the crime. I therefore reject relator's first argument that the acts committed did not constitute a crime under Pennsylvania law. This finding, however, does not eliminate the necessity of my evaluating the statute to ascertain whether as applied to Almeida it was unconstitutionally vague or in violation of the other constitutional issues he has raised.

## II.

The relator contends that his conviction should be reversed because it violates the ex post facto (Article I, Section 10) and due process clauses of the United States Constitution. Specifically, he contends that the application of the rule of Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183 (1949) to him, which rule was allegedly developed subsequent to the homicide for which he was charged, violated his constitutional rights. In addition he contends that the statute under which he was convicted is unconstitutionally vague.

### A.

#### Ex Post Facto Clause

■ Ever since Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915) the meaning of the constitutional provision against ex post facto law making has been considered to be definitively settled. In that case the Supreme Court held that the ex post facto provision applied to legislative action and not to judicial action. The relator contends that the Supreme Court has expanded the coverage of the ex post facto clause so that it now applies to the by-laws or ordinances of municipal corporations and regulations and orders of other instrumentalities of states exercising delegated legislative power. He urges that the instant case falls within the ambit of those decisions. With this I cannot agree.

■ The extension of the ex post facto clause to the legislative branches of the political subdivisions of a state, or to quasi-legislative instrumentalities is but a logical extension of Frank v. Mangum. These subdivisions exercise by delegation the legislative power of the state and as such clearly fall within the ambit of the ex post facto provision. To argue that the Pennsylvania Supreme Court in *Almeida* was exercising a legislative function because it applied the felony murder statute, is to misconceive the nature of the judicial process. The statute in question does not purport to define murder for it is primarily concerned with fixing a penalty; in fact the statute uses the words "[a]ll murder * * * which shall be committed in the perpetration of, or attempting to perpetrate any * * * robbery * * * shall be murder in the first degree." (18 P.S. § 4701.) It was the proper function of the court to interpret the common law and the statute to arrive at some conclusion as to whether, under the circumstances, the relator's actions constituted murder. Having concluded that it did, it applied the statute to determine the degree of the crime.

■ Moreover, in the face of the settled authority of Frank v. Mangum, a

District Court judge is in no position to hold, as the relator suggests, that an "ex post facto" [6] judicial decision should also be regarded as coming within the ambit of Article I, Section 10 of the United States Constitution.

## B.

## DUE PROCESS

### Retroactivity

The relator has advanced the argument that his conviction violated the due process clause of the Fourteenth Amendment because his acts did not constitute murder at the time they were committed. Specifically the relator contends that prior to the Almeida decision it was the law of Pennsylvania that the felony murder doctrine applied only where the killing was done by the felon himself or by one acting in concert with him. This contention was rejected in section I of this opinion, however because a full discussion of relator's arguments may be relevant on review, I will present the reasons for my conclusion.

The relator bases his contention that the Constitution was violated when the doctrine of the Almeida case was applied to him primarily on some language in Commonwealth v. Redline, supra:

> * * * until the decision of this court in Commonwealth v. Almeida, supra, in 1949, the rule which was uniformly followed, whether by express statement or by implication, *was that in order to convict for felony-murder, the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.* [137 A.2d 472 at p. 476.] (Emphasis added.)

The relator thus contends that in *Almeida* the Supreme Court of Pennsylvania overruled previously established law that a felon could be held only for a homicide committed by himself or a confederate. The statement of the majority in *Redline*

is of course entitled to weight, but as I said earlier, it must be balanced against other conflicting statements of the same court. The relator has cited to this Court two cases which he contends expressly or by implication support his position. They are Commonwealth v. Mellor, 294 Pa. 339, 144 A. 534 (1928) and Commonwealth v. Thompson, 321 Pa. 327, 184 A. 97 (1936). In the *Mellor* case the defendants were tried for the murder of a theater manager who was killed during a robbery. Mellor's defense was that he did not fire the fatal shot. On appeal he contended that the trial judge failed to make clear to the jury that he could only be convicted if the Commonwealth proved beyond a reasonable doubt that he had indeed fired the fatal shot or that his confederate had done so. In response to this argument Mr. Chief Justice Von Moschzisker observed that:

> When on the stand in his own defense, Mellor testified that neither he nor the officer fired the first shot, leaving the inference to be drawn that it must have come from Barclay's pistol, yet the major defense at trial seems to have been that Harrison was accidentally killed by a bullet from Clark's revolver. This defense which Mellor's counsel attempted to develop on cross-examination of the commonwealth's witnesses, without gaining any support for it was submitted to the jury in a way favorable to defendant; for the trial judge charged that, if the jurors believed Harrison was killed by a shot from Clark's revolver, Mellor should be acquitted. (294 Pa. at p. 342, 144 A. at p. 535.)

As the quotation above indicates, there was evidence from which the jury could conclude beyond a reasonable doubt that Mellor had fired the fatal shot. Thus, the question of Mellor's liability if the shot had indeed come from the policeman's revolver was never really confronted or decided by the court. The court's opinion dealt primarily with legal questions raised by Mellor's confession and the in-

6. I accept the relator's characterization of the Almeida decision as "ex post facto" solely for the purposes of analysis.

troduction into evidence of his past criminal record. It should be emphasized that a close reading of the opinion in *Mellor* will disclose that the Court was satisfied that there was sufficient evidence to justify a verdict that Mellor or his confederate fired the fatal shot.

In the *Thompson* case the Court found that *"there was ample evidence to justify the jury in finding that it was a bullet from [the] defendant's pistol which killed the deceased."* Thus, as in *Mellor,* the Court was not confronted with a situation where it was forced to consider the question which was present in the *Almeida* case—whether an individual can be convicted of first degree murder for a homicide which neither he nor one acting in concert with him committed.

Thus although I reject the relator's arguments based on the *Thompson* and *Mellor* cases, I am willing to recognize that a not implausible argument can be made, that until its decision in *Almeida* the Pennsylvania Supreme Court had not ruled on the factual situation of that case. Accepting this proposition arguendo, the question presented in *Almeida* would have involved one on which the law was open. That Pennsylvania could fashion a new rule to meet this situation prospectively is clear, the question here is could this rule validly be applied to *Almeida.* I hold that it could.

■ Throughout the development of the common law courts fashioned new rules of law to meet situations for which a previous rule had not been developed. The relator does not deny that this is true, however, he contends that these rules must be prospective in their effect and that to declare Almeida's act to be first degree murder was to apply a "new" rule to him retroactively. *In the judgment of this Court, whether or not a rule may be applied to a defendant in a criminal case depends on whether it may fairly be said that the enunciation of the rule caught the defendant so completely unaware that he had no warning that his conduct was criminal.*

Although not briefed by the relator, it was suggested at argument that this case is governed by the rule of Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). I have studied that case carefully and have concluded that it does not support the relator's contentions. In *Bouie,* the conviction of the petitioners for trespass was reversed by the Supreme Court because it found that they had not been given adequate warning that their act of "sitting-in" was, under the circumstances, criminal. That case can be distinguished from the instant one. In *Bouie,* the South Carolina Supreme Court expressly ignored its past ruling explicitly defining the limits of the criminal trespass statute and *suddenly enunciated a new rule.* Thus the petitioners had expressly relied on past rulings that their acts were not in violation of the South Carolina criminal trespass statute. The relator can hardly contend that there were past rulings of the Pennsylvania Supreme Court clearly holding that his acts did not contravene the felony murder rule, for there were none on which he could be said to have relied. More significantly, the Supreme Court in *Bouie* made it clear that the petitioner's convictions violated the due process clause because:

[where] * * * a judicial construction * * * adds a 'clarifying gloss' to a vague statute * * * making it narrower or more definite than its language indicates, it [follows] * * a fortiori [that the result is the same] * * * where the construction unexpectedly broadens a statute which on its face had been definite and precise. *Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Article I, § 10, of the Constitution forbids.* (at p. 353, 84 S.Ct. at p. 1702, emphasis added.)

It should be noted that at page 362, 84 S.Ct. at page 1707 of its opinion the Supreme Court said: "Application of this rule is particularly compelling where, as here, *the petitioners' conduct cannot be deemed improper or immoral."* (Em-

phasis added.) Although it cannot be predicted whether or not the result in *Bouie* would have been different if the petitioners' conduct had been blameworthy, it should be noted that Almeida's conduct as a robber, was at the very least improper, illegal and immoral. Thus, as the Supreme Court has stated the problem, the resolution of this question becomes one of fair warning. Since this is the same attack raised by the relator on the statute itself the questions merge and I will address myself to both.

The relator contends that he had no prior warning that his actions would be declared criminal after they had taken place, therefore it is important that we determine what kind of a case we have before us. This is not a case where an act clearly not criminal at the time of its occurrence, is so declared to be at some subsequent time. Nor is it a case where criminal responsibility should not attach because the actor could not reasonably understand that his contemplated conduct was proscribed. Rather this is a case where the relator and his confederates deliberately set out to commit an armed robbery, knowing full well that there was a strong possibility that a homicide might occur.

It is my judgment that the specific crime of first degree murder for which the relator was charged was sufficently related to his acts of robbery that as a matter of constitutional law he could be charged with the consequences of that robbery.

The relator implicitly argues that it is true that by perpetrating an armed robbery he was prepared for the consequences which might result from a shooting committed by himself or a confederate, but not for one committed by the police. Presumably he argues that had he known that he would be held responsible for any homicide occurring during the robbery he would not have embarked on such a scheme. Such an argument borders on the preposterous. For me it is almost inconceivable that Almeida or any armed robber (who knows that he could face the death penalty if one of his co-felons might err by firing a fatal shot) would be restrained from perpetrating that robbery solely because there is the possibility of criminal liability if an innocent third party fires the fatal shot. As to the criminal's mind, I cannot imagine such delicate restraint and discernment based solely on the possibility of error by an innocent third party.

■ At most the legal murder issue raised by Almeida's act may have been an open question of law, and the ultimate conviction in issue was by no means so far fetched that the relator was left unaware that his felonious acts caused him to be charged with the crime of murder. Certainly I cannot find that he did not know that his very conduct of armed robbery was proscribed and I cannot say from a constitutional standpoint that the Pennsylvania Courts erred in convicting him for these acts.

## C.

### VAGUENESS OF THE STATUTE

■ Insofar as the relator raised the "void-for-vagueness" argument as an attack on the murder statute, the decision of the United States Supreme Court in United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) is instructive. There the Court noted that:

In this connection we also note that the approach to "vagueness" governing a case like this is different from that followed in cases arising under the First Amendment. There we are concerned with the vagueness of the statute "on its face" because such vagueness may in itself deter constitutionally protected and socially desirable conduct. See Thornhill v. [State of] Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940); N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328 [9 L.Ed.2d 405]. No such factor is present here where the statute is directed only at conduct designed to destroy competition, activity which is neither constitutionally protected nor

socially desirable. *We are thus permitted to consider the warning provided by § 3 not only in terms of the statute "on its face" but also in the light of the conduct to which it is applied.* (At p. 36, 83 S.Ct. at p. 599; emphasis added.)

It is not always true that where the definition of a crime is extended by judicial construction, a conviction which results therefrom is a denial of due process. In the words of Mr. Justice Holmes:

\* \* \* the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. \* \* \* *"The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct."* Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1931). (Emphasis added.)

Similarly, in this case, "common social duty" would have forewarned the defendant that "circumspect conduct" prohibited armed robberies, and since "his judgment is wrong" relator could have, as Mr. Justice Holmes phrased it, incurred even "the penalty of death."

■ In any event it appears that the relator's attack against the statute is misconceived. The statute prescribes that a murder in the perpetration of certain felonies is of the first degree. It does not define murder because it leaves that duty to the courts. It defines only the degree and, implicitly, the penalty. This is not a case of improper legislative delegation because it has been the traditional function of the courts to interpret the common law and those interpretations can result in the restriction or expansion of "former" definitions. I therefore hold that the application of the Almeida decision to the relator did not deny him due process of law under the Fourteenth Amendment.

### III.

### EQUAL PROTECTION

The relator next contends that the decision of the Supreme Court of Pennsylvania in Commonwealth v. Redline, supra, overruled the Almeida case, and if it did not, the effect of that decision was to create an arbitrary classification in violation of the equal protection clause of the Fourteenth Amendment. If *Redline* overruled *Almeida* the relator contends that the failure of the Commonwealth to release him is a denial of equal protection of the laws.

### A.

### DID REDLINE OVERRULE ALMEIDA?

The relator contends that a close reading of the *Redline* decision establishes that it overruled the *Almeida* case, this conclusion I must reject. It is true, as the relator argues, that the decision in *Redline* raised serious questions as to the soundness of the "causation" theory of felony murder enunciated in *Almeida.* In its opinion in *Redline,* the Court observed that:

As we have already seen, the "causation" requirement for responsibility in a felony-murder is that the homicide stem from the commission of the felony. Obviously, the assumed analogy between that concept and the tort-liability requirement of proximate cause is not conclusive. If it were, then the doctrine of supervening cause, which, for centuries, courts have recognized and rendered operative on questions of proximate cause, would have to be considered and passed upon by the jury. But, that qualification, the Almeida case entirely disregarded. (137 A.2d 472, 481.)

Obviously the Court was somewhat less than enchanted with the "causation" theory of felony murder, however, though the Court had the opportunity to expressly abrogate the rule of the *Almeida* case, it specifically failed to do so.

The Court expressly overruled its decision in Commonwealth v. Thomas, 382

Pa. 639, 117 A.2d 204 (1955) in which it upheld the conviction of a defendant for first degree murder for the accidental shooting of his confederate by a policeman, but it did not expressly overrule the *Almeida* decision. Rather it enunciated a rationale by which it was to be distinguished from *Almeida*. It noted that *Almeida* involved the accidental killing of an innocent, law-abiding bystander, whereas the victim in *Redline* was a confederate of the defendant. Therefore, although the Court did not wish to extend the *Almeida* case it clearly did not wish to disavow it completely:

> The limitation which we thus place on the decision in the Almeida case renders unnecessary any present reconsideration of the extended holding in that case. *It will be time enough for action in such regard if and when a conviction for murder based on facts similar to those presented by the Almeida case (both as to the performer of the lethal act and the status of its victim) should again come before thi*s court. (137 A.2d at p. 483). (Emphasis added).

I therefore find that the *Redline* decision did not overrule *Almeida*.

Again I will answer one of relator's alternative premises although I think

his premise has no foundation in law. While I have found that the *Redline* decision did not overrule *Almeida*, I would still conclude that, even if *Redline* had in fact overruled *Almeida*, relator would not as a matter of federal constitutional law be entitled to his release.

 I find that under the facts of this case there would be no federal constitutional obligation to release a person who has been imprisoned by a final judgment of a state court under one state rule of law even though that state rule of law is subsequently changed or repudiated.

It is somewhat analogous to a person being imprisoned for having failed to pay a prior state income tax obligation and then asking for his release because a subsequent legislature abolishes in futuro the state income tax. In Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932), in an opinion by Mr. Justice Cardozo, the Supreme Court held that a state court is permitted to apply a new rule of law to conduct which occurred prior to its announcement, or to give that rule prospective effect only.[7]

---

7. In Sunburst, a Montana statute gave the State Railroad Commission authority to fix rates of carriage for intrastate shipments, and to change the rates upon a showing that they were unreasonable. The statute had been interpreted by the Montana Supreme Court in Doney v. Northern Pacific Railroad, 60 Mont. 209, 199 P. 432 (1921) to authorize a right of recovery for both carriers and shippers for excesses or deficiencies. After a determination that the rates charged it were unreasonable, Sunburst sued Great Northern to recover the excess. The Montana Supreme Court held that its decision in the Doney case was erroneous and that even though the courts could invalidate rate schedules, no right of recovery was created in anyone. The Court held that because Sunburst had relied on the Doney rule it would be permitted to recover, in the future, however, Doney would not be followed. Great Northern appealed to the United States Supreme Court contending that it

was denied due process since the Montana Court followed Doney as to Sunburst's claim but overruled it as to future transactions.

The Supreme Court held that there had been no violation of the Constitution. The Federal Constitution, it said, "has no voice upon the subject." The Court stressed that what was at issue was the question of the extent to which a state court might define limits to its adherence to precedent. The Court held that there were two alternative approaches within the range of permissible choice. On the one hand, a state could say that decisions of its highest court, though later overruled, are law nonetheless for intermediate transactions. On the other hand the state may hold to that

\* \* \* ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered

The recent case of Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) is illustrative of the freedom possessed by courts generally to determine whether or not to make their rulings retrospective. In *Linkletter*, the home of the defendant was searched without a warrant and the products of that search were later introduced into evidence against him at trial. The defendant was then convicted. Subsequent to his conviction, the United States Supreme Court decided Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in which it held that the Fourth Amendment's prohibition against illegal searches and seizures applied not only to the federal government but to the states as well. Linkletter then brought a petition for a writ of habeas corpus arguing that the *Mapp* decision should be applied retrospectively. In an opinion by Mr. Justice Clark the Court rejected this contention. Relying on its previous decision in *Sunburst*, the Court held that the Constitution "neither prohibits nor requires" that retrospective effect be given to its decisions—despite the fact that it had on occasion given retrospective effect to past decisions expounding constitutional rights. Whether decisions are to be given retrospective effect, said the Court, "depends upon a consideration of 'particular relations * * * and particular conduct * * * of rights claimed to have become vested, of status, of prior determinations deemed to have finality'" and of public policy. Clearly if the Constitution does not compel the United States Supreme Court to give retrospective effect to its judgments it can hardly be said to command the state courts to do so, unless of course their own state constitutions compel such a result.[8]

The relator contends that he is the only individual in the state of Pennsylvania who is being incarcerated under the Almeida rule. The uniqueness of his incarceration is a policy argument which may be relevant to a pardon board—however, the uniqueness of one's incarceration is not tantamount to a constitutional breach.

### B.

### DOES THE REDLINE RULE CREATE AN ARBITRARY CLASSIFICATION DENYING TO THE RELATOR THE EQUAL PROTECTION OF THE LAWS?

The relator next contends that even if *Redline* did not overrule *Almeida,* the distinction created by the court in differentiating between *Almeida* and Commonwealth v. Thomas, supra, creates an arbitrary classification in violation of the equal protection clause of the Fourteenth Amendment. The relator finds no rational distinction between a case where the victim is an innocent bystander (Almeida) and a confederate (Thomas).

Whether I would choose to make such a distinction were I in the place of the Supreme Court of Pennsylvania is not the issue. Rather the question is whether the distinction is so lacking in rationality that it cannot be supported. Yick Wo. v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). For the reasons set forth below it is my judgment that this is a distinction which the Supreme Court of Pennsylvania could validly make.

When an individual arms himself with the intention of committing a robbery it is not unreasonable to infer from his act that he has considered its possible dangers. He can be presumed to be aware that there is a definite possibility that an innocent bystander may be killed

declaration as law from the beginning. (287 U.S. at page 363, 53 S.Ct. at page 148.)

In short, the state was free to make its rulings prospective or retrospective as it chose.

8. For an excellent discussion of the rationale of Linkletter v. Walker and the problem of retrospective overruling of constitutional decisions, see: Mishkin, Foreword: The High Court, The Great Writ, and The Due Process of Time and Law, 79 Harv.L.Rev. 5b. See also Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (June 20, 1966).

or that the felon may be killed either by his intended victim, or by another in an attempt to foil the robbery attempt. In short, the felon has clearly created the risk that he or others might be seriously hurt or killed—should an attempt be made to foil the robbery or to prevent his escape. Since an innocent victim did not initiate the original chain of events, the state may be understandably more concerned with vindicating the death of an innocent bystander than that of a felon who is killed in the course of a robbery. It may determine that in light of the circumstances of the innocent victim's death, the felon must be penalized.

 As a matter of public policy the distinction in *Redline* was one which the state of Pennsylvania could validly make. Pennsylvania may make use of its police power in any manner founded in rationality. I cannot say that its decision violated the federal Constitution.

## IV.

### DOUBLE JEOPARDY

The relator has advanced the argument that by trying him a second time the Commonwealth placed him in double jeopardy in violation of the due process clause of the Fourteenth Amendment. A careful reading of the cases which he cites in support of this proposition leads me to the conclusion that it must be rejected.

The thrust of the relator's argument can be seen most succinctly by quoting from page 52 of his brief where it notes that the line of cases cited support the proposition that:

\* \* \* the plea of double jeopardy has been successfully invoked to bar a second trial which was precipitated by some misconduct on the part of the court or prosecutor.

*The relator's statement of the law is accurate in part but it omits an important addition, which is that an individual is placed in double jeopardy not only because there was misconduct by the court or prosecutor but in addition because the first trial was terminated without the* *consent of the defendant and that action was not justified by the circumstances.*

Relator relies upon United States v. Tateo, 216 F.Supp. 850 (S.D.N.Y., 1963), 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), and Commonwealth v. Baker, 413 Pa. 105, 196 A.2d 382 (1964). In the *Downum* case, the trial court discharged the jury at the prosecutor's request after the failure of the prosecution's key witness to appear. A few days later another jury was impanelled and the defendant was convicted. The Supreme Court in an opinion by Mr. Justice Douglas reversed his conviction. The Court held, that where a jury had been impanelled and a trial begun, the failure of the prosecutor to produce his key witness was not an "exceptional circumstance" justifying a mistrial and a subsequent prosecution was barred where the defendant had not consented to the mistrial.

In the *Tateo* case the District Court refused to permit the retrial of a defendant who had pleaded guilty, because the court found that he was coerced into doing so by the trial judge. The Supreme Court reversed the decision of the trial court and noted that:

Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. *From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution.* In reality, therefore, the practice of retrial serves defendants' rights as well as society's

interest. The underlying purpose of permitting retrial is as much furthered by application of the rule to this case as it had been in cases previously decided. (377 U.S. p. 466, 84 S.Ct. p. 1589) (Emphasis added.)

The Court distinguished the *Downum* case on the ground that there the trial had ended before a conviction had been reached, that the circumstances were not exceptional and the defendant's consent was lacking. In conclusion the Court observed that:

> If *Tateo* had requested a mistrial on the basis of the judge's comments, there would be no doubt that if he had been successful, the Government would not have been barred from retrying him. (p. 467, 84 S.Ct. p. 1590.) (Emphasis added.)

Commonwealth v. Baker, supra, upon which the relator also relies, is inapposite for it deals with the double jeopardy rule of Pennsylvania which is concerned with the degree of murder for which one can be retried after a previous trial has been dismissed without a verdict being reached. That case turned only on Pennsylvania law and not on the due process clause of the Fourteenth Amendment.[9]

■ It should also be noted that the Court of Appeals in its opinion upholding the grant of a writ of habeas corpus to the relator after his first conviction observed that "[t]he grant of the writ will not keep Almeida from being tried again for he cannot successfully plead double jeopardy." United States ex rel. Almeida v. Baldi et al., supra, 195 F.2d at p. 825, footnote 30. The relator's contentions as to double jeopardy are overruled.

## V.

## SUPPRESSION OF EVIDENCE

As to the events which occurred before the grand jury, Judge Freedman in his memorandum order appointing counsel phrased the first issue as follows:

> Was the relator deprived of liberty without due process of law despite his plea of guilty because the Commonwealth obtained the indictment by the knowing and wilful suppression of evidence showing who had fired the fatal shot?

Thus, *as to the grand jury proceeding,* the pivotal legal issue here requires a precise specification of what the alleged "suppressed" evidence was; and what were the obligations of the District Attorney to present such "suppressed evidence" to the grand jury. If the District Attorney had no obligation to present such evidence, then by definition there was no violation of the defendant's constitutional rights by the failure to present that evidence to the grand jury. In fact, if the District Attorney had no obligation to present such evidence then it is unfair to categorize his failure to present the evidence as a "suppression of evidence."

The "suppressed" evidence would have been the police officer's testimony that they found near the slain officer's body a .38 caliber blood-stained bullet, and the opinion of ballistic experts that the bullet could not have been fired from the guns of the felons because they were using guns of a different caliber. Thus the inference would be that the bullet came from the gun of an unidentified policeman, since police officers at the scene were using .38 caliber guns. Instead of presenting the testimony which would

9. I assume that the decision of the United States Supreme Court in Brock v. State of North Carolina, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 which renders the double jeopardy clause of the Fifth Amendment inapplicable to the states, does not prevent this court from testing the misconduct in the instant case against the standard of "the very essence of a scheme of ordered justice" by which the due process requirements of the Fourteenth Amendment are measured. Although I have discussed cases brought in the federal courts interpreting the double jeopardy clause of the Fifth Amendment, I have proceeded on the premise that the applicable standard under the Fourteenth Amendment is similar although not coterminous with that of the Fifth Amendment.

support that inference, the District Attorney presented to the grand jury two witnesses (apparently the widow of the victim and one of Almeida's co-felons) who testified that Almeida had fired the fatal bullet. The ballistics evidence contradicting the eye-witnesses was never brought to the grand jury's attention.[10] As of the date of the shooting, the question of who fired the fatal shot was irrelevant to [Almeida's] guilt of murder in the first degree, so long as it was fired in aid of or in resistance to the perpetration of the robbery involved. [187 A.2d 266 at 267.]

Of course the question of who fired the fatal shot would be relevant on the issue of *penalty*—death or life imprisonment, and it was partially because of the materiality of this question on the penalty issue that the Federal Courts sanctioned the granting of the writ of habeas corpus and thereby ordered a new trial.[11]

10. The following colloquy between the representative of the Commonwealth, Mr. John Hassett, and the Court took place at the hearing of March 12, 1965:

> *By the Court*
> Q. May I just ask you point-blank one, two, three whether the Commonwealth concedes this: Do you concede that a witness was permitted to testify before the grand jury that the relator fired the fatal shot?
> *Mr. Hassett:* Yes, sir.
> Q. That you permitted another witness to testify before the grand jury that it was relator's co-defendant that fired the fatal shot?
> *Mr. Hassett:* Yes, sir.
> Q. And that knowing this to be false the Commonwealth did not correct this evidence of false statement presented to the grand jury?
> *Mr. Hassett:* I think witnesses generally give a "Yes, but" answer, and may I say—I would not say knowing this to be false the Commonwealth did not correct it. That I will not admit for what relator charges is that the grand jury heard conflicting evidence as to who fired the fatal shot.
> Q. The gravamen of this case, as I understand it, and I may even require you and I am very much inclined to get you to answer this petition in lawyer-like manner of one, two, three, but just let me—
> *Mr. Hassett:* Let me just say the grand jury was not told of the evidence of the .38 caliber bullet having been found at the scene.
> Q. Yes, and do you concede that the District Attorney as of the time when these witnesses testified before the grand jury knew that these witnesses would so testify and did not advise the grand jury that the shot was fired by persons other than the individuals who committed the crime?
> *Mr. Hassett:* Yes. I am further stating, however, his advice to them should not have been advice. It, of course, should have been—if there was any necessity to prevent it at all it would have been testimony of the finding of a .38 caliber bullet it is significant that I make the distinction because there was no witness to testify to the grand jury that it was a policeman's gun which did the killing. There were only witnesses who could have testified to facts from which the jury could have inferred that it was the policeman's gun.
> Q. I don't think that the issue has to rest in that light, and I am going to reserve my right to go over this petition and perhaps to require more specific answer.
> *Mr. Hassett:* Very well, sir.
> Q. It is not that the District Attorney had the obligation to prove that the shot came from a policeman. I think that factually you have in this case whether the District Attorney had the obligation to present to the jury that the shot could not have come from the guns which the defendants were using.
> *Mr. Hassett:* We will concede that he did not so present evidence, sir. It is the basis of our argument that he was not required to.

11. Judge Welsh specifically held in his opinion, Conclusions of Law 3 and 4 that "[t]he identity of the person who fired the fatal shot was a material question with regard to the *penalty* to be fixed for first degree murder" * * * and "[i]t is the law of Pennsylvania that the jury must weigh all the circumstances of the case in fixing the *penalty*." 104 F.Supp., p. 328. Chief Judge Biggs writing for the Court of Appeals said: "Who killed Ingling was a relevant issue, as to *penalty* to be imposed by the jury at the trial, perhaps the most relevant one. Under the Act of June 24, 1939, the jury had the power of life or death over Almeida. In the court below as in this court the Commonwealth contended that the question of who fired the

However, if under the facts of this case the issue as to who fired the shot (relator, co-felons, or a third party) was immaterial in the determination as to whether the crime of murder in the first degree had been committed, a pivotal question then becomes whether it was incumbent for the Commonwealth to present the conflicting or "exculpatory" evidence which would suggest that relator did *not* fire the fatal shot in issue. The authorities appear to be unanimous that at the grand jury proceedings the District Attorney has no burden to present evidence which is favorable or exculpatory in behalf of the defendant.

* * * as bearing on the scope or extent of the grand jury's consideration of the charge before it, attention may be called to the general rule that *a defendant has no right to have evidence exonerating him go before the grand jury* or to introduce witnesses in his behalf, thereby converting the grand jury into a traverse or trial jury. This is in accordance with the pronouncement by Blackstone that *grand juries "are only to hear evidence in behalf of the prosecution;* for the finding of an indictment is only in the nature of an inquiry or accusation, which is afterwards to be tried and determined; and the grand jury is only to inquire upon their oaths whether there be sufficient cause to call upon the party to answer it." American Jurisprudence, Grand Juries, § 46, Consideration of Matters Before Juries, 24 Am. Jur. 864, 865. (Emphasis supplied.)

See also: Charlton v. Kelley, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); United States v. White, Fed.Cas. No. 16,-685; United States v. Terry et al., 39 F. 355 (N.D.Cal., 1889).

Commentators are agreed that the scope of inquiry by grand juries in Pennsylvania is similarly limited:

The grand jury should hear evidence *only on behalf of the prosecution* to determine whether there is sufficient cause to find an indictment or accusation to be thereafter tried and determined by a petit jury, and in its consideration of such indictment, it must resolve all doubts in favor of the Commonwealth. 17 Pa. Law Encyclopedia 152 Grand Jury, § 9. (Emphasis added).

See also: Commonwealth v. Burney, 1945, 30 North 26; Respublica v. Shaffer, 1 Dall. 236, 1 L.Ed. 116 Supreme Court of Pennsylvania (1788).

The recent case of West v. United States, 359 F.2d 50 (8th Cir., April 20, 1966) confirms the principle which has just been stated. In the *West* case the defendant contends that the indictment which had been returned against him was defective because some of the evidence which the grand jury considered had been obtained as a result of an illegal search and seizure. In rejecting this contention the Court of Appeals observed that:

The case of Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) held that illegally seized evidence could not be introduced in a federal criminal trial. We are aware of no case which extends this rule to grand jury proceedings. In fact the Supreme Court has held that grand jury consideration of inadmissible evidence does not render the indictment defective. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). An indictment is only a formal charge, necessitated by our sys-

---

fatal shot was irrelevant to the issue of whether Almeida was or was not guilty of first degree murder, citing the decisions of the Supreme Court of Pennsylvania in Almeida's case and in the Moyer case. With this we agree. But the Commonwealth has never given any answer as to why the evidence to which we have referred, suppressed as the court

below found it to have been, was not pertinent as to the issue of the penalty to be imposed by the jury on Almeida. Putting it bluntly, there is no answer for it is obvious that in weighing penalty the jury would have to consider whether Almeida intended to kill Ingling. (195 F.2d 815, 819, 820.)

tem of law, to bring an accused into court to answer the charge made, and all evidence necessary to substantiate that charge beyond a reasonable doubt must be introduced at the trial—incompetent or inadmissible evidence, for whatever reason properly urged, is not admitted and of course could not affect the trial proceedings. (359 F.2d p. 55.)

The grave difficulties which the relator's argument would create, were it to be adopted, are graphically illustrated in the following statement from *West:*

Furthermore, as a practical matter, the United States District Attorney is the only person with free access to a grand jury. In such a situation the accused has no practical opportunity to object to evidence before it is presented to the grand jury. Likewise, since a judge is not presiding, it would be difficult, if not impossible, at this point in the litigation to have a final and binding determination of the legality of offered evidence. If we adopted appellant's position we would be faced with two alternatives. We could leave the essential nature of the grand jury proceeding unchanged. The government would then be forced to make an ex parte determination of the legality of the offered evidence without the guidance of opposition or ruling from judicial authority. The penalty for a mistake in judgment would be the striking down of the entire grand jury proceeding. We could, on the other hand, change the nature of the grand jury investigation, making it into an adversary system. The exclusionary rule could then be enforced by a case-by-case judicial determination. Such a change, however, would add an additional burden to judicial time, completely alter our judicial system, and seriously cripple the supposedly investigative purpose of the grand jury. We do not believe such a move is warranted or wise and consequently hold that the exclusionary rule does not apply to grand jury proceedings. (359 F.2d p. 56)

In United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (May 23, 1966), the United States Supreme Court, although not ruling directly on this issue, has given strong support to the holding in *West* and the position which I have taken here. In *Blue* the District Court refused to permit the prosecution, for tax evasion, of a taxpayer who had previously given information to the government while contesting a deficiency suit. The District Court was of the opinion that the criminal action was barred by the Fifth Amendment's injunction against self-incrimination. The Supreme Court reversed the lower court's ruling noting that:

Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. (86 S.Ct. p. 1419.)

Even more significant is the following footnote to the Court's opinion:

It does not seem to be contended that tainted evidence was presented to the grand jury; but in any event our precedents indicate this would not be a basis for abating the prosecution pending a new indictment, let alone barring it altogether. See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321; 8 Wigmore, Evidence § 2184a, at 40 (McNaughton rev. 1961). (Footnote 3, 86 S.Ct. p. 1419.)

I am mindful that under certain circumstances the acts of a prosecutor in presenting a case to a grand jury could constitute a breach of a defendant's constitutional rights. But the act of the prosecutor, in failing to present exculpatory or conflicting evidence in this case does not reach the dimension of a constitutional deprivation. Thus the instant case must be distinguished from an intentional presentation of perjured testimony, cf. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791

(1934), Hysler v. State of Florida, 315 U.S. 411, 316 U.S. 642, 62 S.Ct. 688, 86 L.Ed. 932 (1942) and Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). There is no inference in this case that at the grand jury proceeding the prosecuting attorney prepared or created fraudulent evidence. Cf. Chessman v. Teets, 350 U.S. 3, 76 S.Ct. 34, 100 L.Ed. 4 (1955). Finally, the instant matter does not involve a case where the prosecutor has wilfully presented testimony which he knew to be false—Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959).

In the instant matter there was conflicting evidence: (1) the opinions of two persons who claim that relator fired the fatal bullet, and (2) in contrast, the ballistic testimony that the .38 caliber blood-stained bullet found near the deceased came from a gun of different caliber than those being used by the felons. In terms of the actual truth one of these inferences had to be wrong. Almeida or his co-felons either fired the fatal shot or did not. Thus one must balance the opinion of eyewitneses who claim relator fired the shot against the finding of the ballistics experts that the relator's gun could not have fired the fatal shot. If one grants greater credibility to scientific opinions, one might conclude that relator did not fire the fatal bullet; if on the other hand, one places less weight on the "scientific" finding and grants greater weight to the testimony of eyewitnesses, then the eyewitnesses' testimony would be the most persuasive. I emphasize that this conflict goes to the weight of the testimony and does not reach the point where a finder of fact, and more specifically, the district attorney was compelled to conclude that the ballistics testimony was so persuasive and it so vitiated the eyewitnesses' testimony that it eliminated the conflict in the evidence.

I submit that at trial, a judge would be in error if he denied the Common-

wealth, under the facts of this case, the right to present eyewitness testimony that the relator had fired the fatal shot. Thus the instant case cannot be categorized as one where a prosecutor wilfully presented false testimony, rather, it must be categorized as a situation where the prosecutor presented to the grand jury only that testimony which was favorable to the Commonwealth; and such was his prerogative.

 Of course the wilfull withholding of such exculpatory evidence at trial would constitute a violation of the due process clause of the Fourteenth Amendment. In fact, the withholding of such information at the relator's first trial was held to have violated the Constitution. However, I do not read Brady v. State of Maryland, supra, or any of the authorities cited by the relator, as requiring a District Attorney to present evidence favorable to a defendant to the grand jury. The language which is most favorable to the relator appears in Brady v. State of Maryland, 373 U.S. 85, 87, 83 S.Ct. 1196, 10 L.Ed.2d 215, where the Court said: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." While the language of Brady is broad, it is clear from the facts that the Court was not considering a grand jury proceeding, but rather solely those events which had occurred at the actual trial. Thus, its holding is not applicable to a grand jury proceeding. In United States ex rel. Thompson v. Dye, 221 F.2d 763 (3rd Cir., 1955), the Court of Appeals phrased the issue as follows: "The important question before us is whether the district judge erred in holding as a matter of law that the withheld and suppressed evidence was not vital to the defense of the accused." As I review the applicable constitutional law, the evidence "withheld" from the grand jury "was not vital to the defense of the accused" because

he had no right to have that evidence presented to the grand jury. Admittedly, it was vital to the defense of the relator when on trial, however, it need not have been presented to the grand jury.[12]

Before signing the order of dismissal, I must note the Court's appreciation and commendation for the superb, dedicated and exhaustive services rendered by Jerome Shestack, Esquire, as court appointed counsel. Mr. Shestack and his associates have canvassed with thoroughness all issues which could be possibly raised in relator's behalf, and they have obviously spent hundreds of hours in the careful preparation and presentation of relator's case. Relator has had similar good fortune before in that from the time of his first trial he has been represented by some of Pennsylvania's most able lawyers, most of whom were either court appointed or served without compensation. Thus his continued incarceration is solely attributable to the fact that for some cases there are no loop holes. Though the United States Constitution embodies great principles guaranteeing liberty, freedom and due process, that same great Constitution is nevertheless not a fulcrum for the automatic release of prisoners who have less than meritorious claims.

The petition is therefore denied.

12. As I indicated earlier, there have been cases in which indictments have been voided because they were obtained in violation of the defendant's constitutional rights. Roughly there are three notable categories of such cases:
(1) Indictments secured from grand juries based on testimony obtained in violation of the defendant's privilege against self incrimination. United States v. Lawn, 115 F.Supp. 674 (S.D.N.Y.1953); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919); Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318 (1942); United States v. Miller, 80 F.Supp. 979 (E.D.Pa.1948).
(2) Indictments, obtained from grand juries where members of defendant's race were systematically excluded from the grand jury. Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947).
(3) Indictments secured from a grand jury based on evidence obtained through means of an unlawful search and seizure. United States v. Bush, 269 F. 455 (W.D. N.Y., 1920); United States v. Yuck Kee, 281 F. 228 (D.Minn., 1922); United States v. Smith, 23 F.Supp. 528 (E.D. Mo.1938).
The indictment in the instant case, however, does not possess any of the attributes of constitutional infirmity which invalidated those in the cases listed above.