Charles D. **BOBLIT,** 5987, Petitioner,

v.

**WARDEN, MARYLAND PENITEN-
TIARY, Respondent.**

**Civ. A. No. 20998.**

United States District Court,
D. Maryland.

Oct. 26, 1972.

---

Charles D. Boblit, pro se.

Francis B. Burch, Atty. Gen. of Md. and Alfred J. O'Ferrall, III, Asst. Atty. Gen., Baltimore, Md., for respondent.

WATKINS, District Judge.

## OPINION AND ORDER

Petitioner, presently incarcerated in the Maryland Penitentiary, seeks habeas corpus relief in this Court. On March 2, 1959, petitioner was tried in the Circuit Court for Anne Arundel County on an indictment charging first degree murder; thereafter he was found guilty by Judge Benjamin Michaelson, sitting without a jury. Petitioner was sentenced to death, and on September 24,

1959, his conviction was affirmed by the Maryland Court of Appeals. Boblit v. State, 220 Md. 454, 154 A.2d 434 (1959). On November 20, 1959, petitioner filed for relief under the Maryland Post Conviction Procedure Act alleging incompetency of counsel, and on November 27, 1959, Judge O. Bowie Duckett denied the petition, with no application for leave to appeal being taken by Boblit. Petitioner's last petition for State Post Conviction relief was filed on July 14, 1965, in which he raised various issues and among them are those for which he now seeks relief in this Court. Judge Ridgely P. Melvin denied the petition in an unpublished Memorandum Opinion and Order filed on February 3, 1959. Finally, on June 2, 1969, the Maryland Court of Appeals in Boblit v. Warden, 254 Md. 36, 253 A.2d 525 (1969), denied petitioner's application for leave to appeal:

"PER CURIAM:

The application of Charles D. Boblit for leave to appeal from denial of Post Conviction relief by Judge Ridgely P. Melvin, Jr., on February 3, 1969 is denied for the substantive reasons (as distinguished from reasons based on waiver or for failure to have raised the point at trial) set forth by Judge Melvin in his opinion denying relief.

Application denied."

In this petition Boblit raises three issues (literal transcription where quoted):

1. "Illegal arrest and detention" in that "the police were acting on mere suspicion from an anonymous tip. Suspicion does not constitute probable cause."

2. "Failure to advise petitioner of his right to remain silent, or to the right to counsel" in that "the police did not tell petitioner he was entitled to an attorney or that he didn't have to say anything".

3. "State's attorney willfully withheld information from proper authorities of Sprin Grove State Hospital" in that "the State's Attorney refused to submit to the authorities of Spring Grove State Hospital, information by which a. coplete evaluation of his mental state was at time of the crime"

The basic facts of the crime, except as to which of the two robbers, Boblit or Brady,[1] did the actual killing of the victim, are not in dispute and are best summarized by the Maryland Court of Appeals in Boblit v. State, 220 Md. 454, 154 A.2d 434 (1959):

"It is conceded that Brady and Boblit lay in wait for the victim, William Brooks, placing a log across his private driveway, in order to obtain possession of his car and money. Boblit was armed with a shotgun and Brady with a pistol. When Brooks got out of his car, Boblit struck him in the head with the barrel of the shotgun. They placed Brooks in the car, and after driving a certain distance, they carried Brooks into the woods, where one of them throttled him with Boblit's shirt. Each claimed that the other had actually strangled Mr. Brooks. They concealed the body and divided the contents of Brooks' pocketbook containing some $250. They abandoned the car near Lynchburg, Virginia. Boblit went home, Brady fled to Florida."

As to the circumstances surrounding the arrest, detention, and withholding of information, petitioner has set out no facts to indicate what he contends to be unlawful other than what is quoted above. Under these circumstances, this Court could properly summarily dismiss these issues since they are merely "bald assertions[s]", conclusory in form and unsupported by facts. Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1962); Whitley v. Steiner, 293 F.2d 895 (4 Cir. 1961), cert. dismissed, 368 U.S. 980, 82 S.Ct. 476, 7 L.Ed.2d 521 (1962); Midgett v. land, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).

---

1. Boblit's accomplice in the crime was the infamous petitioner in Brady v. Mary-

Warden, 329 F.2d 185 (4 Cir. 1965); Fulford v. Smith, 432 F.2d 1225 (5 Cir. 1970); Mackey v. Oberhauser, 437 F.2d 120 (9 Cir. 1971). But cf. Coleman v. Peyton, 362 F.2d 905 (4 Cir. 1966), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966), discussing Coleman v. Peyton, 340 F.2d 603 (4 Cir. 1965).

■ Moreover, petitioner's first claim, that he was illegally arrested and detained, is insufficient grounds for collateral relief from a conviction unless the arrest in some way deprived him of a fair trial, a claim he has not made in this Court. Brooks v. Smith, 429 F.2d 1281 (5 Cir. 1970); Abraham v. Wainwright, 407 F.2d 826 (5 Cir. 1969); Hernandez v. Schneckloth, 425 F.2d 89 (9 Cir. 1970); Hachey v. Maine, 453 F.2d 369 (1 Cir. 1972); Freeman v. Page, 443 F.2d 493 (10 Cir. 1971), cert. denied, 404 U.S. 1001, 92 S.Ct. 569, 30 L.Ed.2d 554 (1971). See Vance v. North Carolina, 432 F.2d 984 (4 Cir. 1970); Brewer v. Peyton, 431 F.2d 1371 (4 Cir. 1970), cert. denied, Brewer v. Cox, 401 U.S. 994, 91 S.Ct. 1239, 28 L.Ed.2d 533 (1971).

■ Similarly, petitioner's second claim, that he was not advised of his right to counsel or to remain silent, even if true, would not be cognizable in an habeas corpus petition without at least an allegation of prejudice. See Culombe v. Connecticut, 367 U.S. 568, 600, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Therefore, for these additional reasons, petitioner's first and second claims are again dismissible.

However, in response to a show cause order, the respondent has submitted to this Court:

1. Petitioner's trial transcript;

2. Petitioner's first petition under Maryland's Post Conviction procedure;

3. The Memorandum and Order denying the first petition;

4. Petitioner's second petition for Post Conviction relief and petitioner's memorandum in support of the second petition;

5. The Memorandum and Order denying this second, and last, petition;

6. Records of Spring Grove State Hospital; and

7. The transcript of the last Post Conviction proceeding.

■ This Court has examined the above record and finds as a fact and concludes as a matter of law that the petitioner received a full and fair hearing covering the issues raised in the instant petition and that the findings of fact and conclusions of law are correct and are amply supported by the comprehensive record, not only making it unnecessary to have a plenary hearing but also, for the reasons as hereinafter stated, justifying the dismissal of this petition.[2] Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Moorer v. South Carolina, 347 F.2d 502 (4 Cir. 1965); United States ex rel. Fein v. Deegan, 410 F.2d 13 (2 Cir. 1969), cert. denied, 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450 (1969); Piche v. Rhay, 422 F.2d 1309 (9 Cir. 1970); Younger v. Cox, 323 F.Supp. 412 (W.D.Va.1971); Bryant v. Cox, 312 F.Supp. 218 (W.D. Va.1970).[3]

2. In addition, the record contains substantial evidence fully supporting the conviction, Grundler v. North Carolina, 283 F.2d 798, 801 (4 Cir. 1960). It is noted that petitioner has never claimed that he did not commit the robbery or that there was not an agreement to kill the victim. He merely asserts that Brady did the killing. Boblit v. State, 220 Md. 454, 457, 154 A.2d 434 (1959); Trial Transcript at page 132 (hereinafter referred to as T.T.).

3. The requirement of Atkinson v. Maryland, Civil Action No. 14714 (4 Cir. 1971), (unreported Memo. Decis.), "that a district judge may not rely on state findings of fact unless he has from the state court records determined that the findings are supported by the record and were made after a full and fair evidentiary hearing meeting the requirements of *Townsend*", has recently been affirmed by the Fourth Circuit in Stevenson v. Avery, Civil Action No. 14817 (4 Cir.

Aside from petitioner's third claim, the Court is of the opinion, giving liberal construction to petitioner's claims, Coleman v. Peyton, 362 F.2d 905 (4 Cir. 1966), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966), discussing Coleman v. Peyton, 340 F.2d 603 (4 Cir. 1965), that the first two claims are being asserted in order to have petitioner's confession adjudicated involuntary although this position is nowhere alleged in the petition as submitted to this Court for consideration, nor has it been dealt with in any state court proceeding. Accordingly, the voluntariness of the confession will be considered on the merits, with the other allegations listed above, notwithstanding petitioner's failure to exhaust his state remedies on this issue.

■ Since petitioner's conviction was in 1959, the law as to voluntariness of confessions must be determined as of that date. Any use of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) or Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is foreclosed by Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) wherein Escobedo and Miranda were not accorded retroactive application. As to what is the case law on confessions alleged to have been coerced, prior to the Escobedo and Miranda cases, the Supreme Court in Johnson stated (at 730, 86 S.Ct. at 1779):

"[O]ur case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.

Ed. 837 (1963). Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance. See Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Thus while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the non-retroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim."

In Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961), the Supreme Court set out guidelines for determining voluntariness:

"But it is hardly necessary to state that the question whether a confession was extracted by coercion does not depend simply upon whether the police resorted to the crude tactic of deliberate physical abuse. '[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v. State of Alabama, 361

---

1971) (unpublished Memo. Decis.) and Locklear v. Maryland, Civil Action No. 15268 (4 Cir. 1972) (unreported Memo. Decis.). It would appear, then, that the Fourth Circuit would still require the procedure set forth in the paragraph to which this is a footnote notwithstanding the 1966 amendment to 28 U.S.C. § 2254. *But cf.* Hamric v. Bailey,

386 F.2d 390, 393 (4 Cir. 1967). However, this cannot be concluded with certainty since the rendition of Jones v. Virginia, Civil Action No. 71–1808 (4 Cir. 1972) where the court stated that unpublished memorandum decisions are not to be treated "as precedent within the meaning of the rule of stare decises".

U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242. The question in each case is whether a defendant's will was overborne at the time he confessed. Chambers v. State of Florida, 309 U.S 227, 60 S.Ct. 472, 84 L.Ed. 716; Watts v. State of Indiana, 338 U.S. 49, 52, 53, 69 S.Ct. 1347, 1348–1349, 93 L.Ed. 1801; Leyra v. Denno, 347 U.S. 556, 558, 74 S.Ct. 716, 717, 98 L.Ed. 948. If so, the confession cannot be deemed 'the product of a rational intellect and a free will,' Blackburn, supra, 361 U.S. at page 208, 80 S.Ct. at page 280. In resolving the issue all the circumstances attendant upon the confession must be taken into account. See Fikes v. State of Alabama, 352 U.S. 191, 198, 77 S.Ct. 281, 285, 1 L.Ed.2d 246; Payne v. State of Arkansas, 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975. Physical mistreatment is but one such circumstance, albeit a circumstance which by itself weighs heavily. But other circumstances may combine to produce an effect just as impellingly coercive as the deliberate use of the third degree."

Further, in Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343–1344, 10 L.Ed.2d 513 (1963) the Court again elaborated on the criteria used to examine the admissibility of a confession:

"We have only recently held again that a confession obtained by police through the use of threats is violative of due process and that 'the question in each case is whether the defendant's will was overborne at the time he confessed,' Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922. 'In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort.' Wilson v. United States, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090. See also Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568. And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances. See, *e. g.*, Leyra v. Denno, 347 U.S. 556, 558, 74 S.Ct. 716, 98 L.Ed. 948.[10]

10. See also Fikes v. Alabama, 352 U.S. 191, 197–198, 77 S.Ct. 281, 1 L.Ed.2d 246; Gallegos v. Nebraska, 342 U.S. 55, 65, 72 S.Ct. 141, 96 L.Ed. 86 (opinion of Mr. Justice Reed).

\* \* \* \* \*

"We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here— the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects. Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated. \* \* \* "

Finally, shortly after petitioner's conviction, the Supreme Court had occasion in Culombe v. Connecticut, 367 U.S. 568, 601, 81 S.Ct. 1860, 1878–1879, 6 L.Ed.2d 1037 (1961) to consider whether or not any specific restrictions should be placed on the conditions under which a confession was taken (footnotes omitted):

"In light of our past opinions and in light of the wide divergence of views which men may reasonably maintain concerning the propriety of various police investigative procedures not in-

volving the employment of obvious brutality, this much seems certain: It is impossible for this Court, in enforcing the Fourteenth Amendment, to attempt precisely to delimit, or to surround with specific, all-inclusive restrictions, the power of interrogation allowed to state law enforcement officers in obtaining confessions. No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by McNabb; nor failure to caution a prisoner—enjoined by the Judges' Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. See Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448; Ashdown v. State of Utah, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443.

"Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

The facts surrounding the initial confrontation the petitioner had with the authorities were thoroughly explored at the Post Conviction hearings of June 25, 1968, and July 30, 1968, and, except as to advice as to rights, are uncontested by the petitioner.[4] Although some of the trial testimony is helpful in determining what occurred, that transcript is not as complete as the one produced at the Post Conviction hearing since there was no concerted effort on the part of petitioner's two experienced attorneys at trial to contest the voluntariness of the confessions—a correct determination in view of the evidence as hereinafter set out.

At the outset it is noted that Boblit is 25 years old, single, and was living with his mother and father at the time of this offense. At the age of sixteen, while in the seventh grade, petitioner quit school. He was diagnosed at Spring Grove State Hospital to have a passive-aggressive personality, not psychotic at the time of the crime or while in the hospital; and able to participate in his own defense. Petitioner had a history of positive syphilis but manifested no

---

4. Petitioner now alleges, although he did not at trial, that he was not advised of his "rights" as set out in his list of claims. The *Culombe* case points out that there was no absolute requirement to do so in 1959. Moreover, this Court finds that he was told within minutes after he first met the authorities and entered their car that "he had to make no statement and that any statement he made might be used against him in Court, also, that he was entitled to have a lawyer represent him", and that these "rights" were given before any questioning was instituted. T.T. at 11; Post Conviction Transcript of June 25, 1968 at 62 (hereinafter referred to as P.C. Tr. of June); Post Conviction Transcript of July 30, 1968, at 10, 49 (hereinafter referred to as P.C. Tr. of July). As to any admonitions given Boblit right before he confessed, that will be discussed *infra*.

physical signs of progression of this disease. Boblit's intellectual functioning at the time of his examination was "in the Borderline range as seen by a Full Scale I.Q. of 78, with a verbal I.Q. of 76, and a Performance I.Q. of 84. His capacity is in the average range. However, it is not realized because of his concrete thinking, poor judgment, and lack of interest, as well as lack of formal training". Additionally, it was stated in the Spring Grove Report that Boblit "possesses the potential of average mental endowment . . . [and] his potential was felt to be within the normal range by the testing psychologist." Finally, it was the "examiner's belief the patient, both at the time of the alleged offense and at the time of the testing, could be considered a responsible agent as he himself stated he did know what he was doing at the time of the alleged offense".

Robert T. Hickman, an F.B.I. agent, testified at the Post Conviction hearing of June 25, 1968, why he, accompanied by another agent, Mr. Feeney, went to question Boblit and what occurred after they arrived at his home. (P. C. Tr. of June at 96):

Q. "Please state to the Court your purpose for coming to Anne Arundel County?

A. "We were instructed by the Assistant Special Agent in charge of the FBI in Baltimore, that is, Mr. Feeney and I, to come to Anne Arundel County and to join or to contact a searching unit made up of police and FBI agents that were working down in the Patuxent River area, down around, somewhere around Odenton. We went there to contact them because a Mr. Brady, who was in either Havana, Cuba or Miami at the time had stated that he and Boblit had been riding around on the night of June 28th, early morning hours and at that time Brady had parked his personally owned car around Quarterfield Road and had left Mr. Boblit in it. While he was away

from his car, he placed a log across the road of one William Brooks knowing that Mr. Brooks would come home in the early morning hours after work at the National Plastics Company. When Mr. Brooks came in, Brady said that Brooks got out of his car to remove the log from the private road—at that time he, Brady, struck Brooks over the head with an iron pipe. After that, he disposed of the body of Mr. Brooks and returned in the new '58 Ford car of Mr. Brooks, picked up Boblit. Boblit stated— asked him where he got the new car. He said he borrowed it, or words to that effect. Now we had had men out searching in that area around Patuxent River where the body of Brooks was supposed to be located. There were some, I would estimate fifty to seventy-five men, a total of that many men, searching for the body of Brooks. We decided that since Mr. Boblit had been with Brady all the time on that date that we would contact him, which we did. Mr. Keissling—Corporal Keissling [sic, Kiessling], Mr. Feeney and myself located Boblit in Odenton, Maryland.

Q. Who entered—when you arrived at Mr. Boblit's home, who entered the house first?

A. Corporal Keissling [sic, Kiessling] and I. I can't tell you which of us. We went in together.

Q. Who answered the door?

A. Mr. Boblit, to the best of my recollection. Not the defendant, the petitioner, his father.

Q. The petitioner's father answered the door?

A. Right.

Q. Did you state to the petitioner's father the purpose for coming to the house?

A. Yes.

MR. BRICE: Objection. This has no bearing on the case whatsoever.

COURT: Overruled. Go ahead.

A. We told his father that we would like to talk to the petitioner, Charles Donald Boblit.

Q. Did you state what you were going to talk about?

A. No sir.

Q. Did Mr. Boblit's father invite you into the home or did you wait outside?

A. He invited us into the livingroom and he called Donald, I believe, at that time, the petitioner. He was upstairs and he came down, to the best of my recollection.

Q. How was Boblit dressed when you first saw him?

A. I believe he was barefoot, possibly wearing a pair of dungarees, could have had an undershirt on. I'm not sure about the latter. That's to the best of my recollection.

Q. Did you ask or did you interrogate Mr. Boblit in the home?

A. No sir. Interrogate. Please explain what you mean?

Q. Did you request that Mr. Boblit—did you request Charles Boblit to accompany you?

A. Yes we did. We told him we were conducting an investigation, we'd like him to come to Ferndale with us, to headquarters and to talk with us about a case in which Brady was involved.

COURT: Did you identify yourselves?

MR. HICKMAN: Very definitely, sir.

Q. What was your attire at the time you went to the house?

A. I'm sure that I was in a business suit. I always wore one.

Q. Do you recall how Corporal Keissling [sic, Kiessling] was dressed at the time?

A. He was dressed in plain clothes, yes.

Q. Plain clothes?

A. Plain clothes, yes.

COURT: You told him that you were investigating what?

MR. HICKMAN: A case involving Mr. Brady, or I might have called him whatever Brady's first name is. Our interest at that time was in Mr. Brady.

Q. What did you tell Boblit as to your interest in Mr. Brady?

A. I can't recall any specifics on that sir.

Q. Well, you said you wanted to know about Mr. Brady. What did you want to know about him?

MR. BRICE: Objection.

COURT: You asking him what did he ask the defendant?

MR. HOFFMAN: Yes sir. His conversation, Your Honor, his . . .

COURT: Well, I think he's already explained that they were looking for the body.

MR. HOFFMAN: Well at this particular point, we are up to the fact that he told Mr. Boblit, Charles Boblit, the petitioner, that he wants to talk about Mr. Brady with him. Based on that, then they started to leave the premises. That was his purpose for being there. The question is now just what did he ask of Mr. Boblit about Mr. Brady. What was the nature of the question.

MR. BRICE: The witness has simply testifed in response to Mr. Hoffman's question that their interest was purely in Mr. Brady at the time and what he wanted to talk to the petitioner about Brady certainly has no bearing on the issues in this case nor any of the contentions raised in the petition.

MR. HOFFMAN: The conversations that are . . . .

COURT: Go ahead. You can ask the question, I'll let him answer.

Q. Please state your conversation with Mr. Boblit concerning Mr. Brady.

A. Mr. Boblit wanted to get additional clothing which he did, I'm sure, at this time, I'm not positive of that but I'm quite sure of it. I did not talk to him about Mr. Brady any further in his home, to the best of my recollection. Does that answer your question sir?"

On these points Agent Feeney's testimony paralleled that of Agent Hickman quoted above. See P. C. Tr. of June at 60.

What transpired between the time Hickman and Corporal Keissling, of the Anne Arundel County Police Department, first confronted Boblit in his home at about 5:55 p.m. and then subsequent arrival at the Police Station at 6:08 p. m., is appropriately explained by Keissling (P.C. Tr. of July 8):

Q. "In Boblit's presence did Agent Hickman say anything to Boblit?

A. Yes.

Q. What did he say to him, please?

A. He stated the reason for our presence there.

Q. And what was that?

A. It was understood that he may have some information concerning the—a missing gentleman by the name of Mr. Brooks and wished to talk with him about it.

Q. Was that done inside the Boblit home?

A. Yes.

Q. Was there anyone else in the home —was there any other police officers in the home besides you and Agent Hickman at that particular time?

A. I'm sure Agent Feeney joined us in the home after we had got in.[5]

Q. Did you—did you have—did you have occasion to leave the Boblit home?

A. Yes.

Q. Who was with you at that—when you left?

A. Agents Hickman, Feeney and Donald Boblit.

Q. Did any one escort Charles Boblit out of the house? Out of the Boblit home?

A. Not to my recollection?

Q. Was Boblit—in whose custody was Boblit when you—when you left the Boblit home?

MR. BRICE: Objection. Hasn't been established that he was in the custody of anyone.

COURT: I'll sustain the objection.

Q. Was Boblit—Was Boblit in custody when you left the Boblit home?

A. No.

Q. Are you saying he was not in the Anne Arundel County Police custody or he was not in the custody of Federal agents of the Federal Bureau of Investigation?

MR. BRICE: Objection, Your Honor. It's not a question. It's argumentative.

COURT: I'll overrule the objection.

MR. HOFFMAN: Did you overrule on it, Your Honor?

COURT: Yes.

A. I would say he was not in custody.

He was asked if he would accompany us to discuss this matter. And that would have been myself, Agents Hickman and Feeney.

---

5. Agent Feeney entered the home from the rear of the house. P.C. Tr. of July at 5. This Court attaches no significance to this type of "precautionary measure".

Shorey v. Warden, Maryland State Penitentiary, 401 F.2d 474, 478 (4 Cir. 1968), cert. denied, 393 U.S. 915, 89 S.Ct. 241, 21 L.Ed.2d 201 (1968).

Q. Was—was there any questioning done from the time that you left the Boblit home with Boblit 'til you arrived at your destination? Not to my knowledge.[6]

Q. Did you take—when you left the Boblit home with the petitioner Charles Boblit, where did you go?

A. Back to Anne Arundel County Police Headquarters, Ferndale Detective Bureau.

Q. Do you recall any conversations in Boblit's presence on the trip from Boblit's home to Ferndale?

A. I recall Agent Hickman advising Charles Donald Boblit of his rights as a citizen.

Q. Who was driving the car at that particular time, if you recall.

A. Agent Feeney, to the best of my knowledge.

Q. When you arrived at Ferndale, was Charles Boblit interrogated?

A. Briefly, yes.

Q. What do you call briefly in amount of time?

A. We arrived at the police station at six-o-eight p. m. at the detective bureau for a brief interrogation, and at six twenty-five p. m. we were back in the Patuxent River area.

Q. Was Charles Donald Boblit in your presence during all this time?

6. During the trial the word "custody" was used in one of the questions to describe how Boblit was brought to the police station. T.T. at 6. Not only was this explored in the Post Conviction hearing and found to be a misnomer, a conclusion that this Court agrees with, P.C. Tr. of June at 60–92, 105; P.C. Tr. of July at 8, but also "[t]o make constitutional questions turn on the term chosen by police officers to describe their activity—officers who are accustomed to the vernacular of the police station and unschooled in the accepted constitutional vocabulary—is to engage in a futile and unwarranted exercise is semantics". Ralph v. Pepersack, 335 F.2d 128, 134 (4 Cir. 1964), cert. denied 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965).

A. Yes.

Q. Will you tell the Court what conversations you had with Boblit while you were back at Ferndale.

A. I can't remember detailed conversations. I do know we asked him if he knew anything about the whereabouts of Mr. Brooks, I do know that he told us, Yes, and that he would show us where Mr. Brooks was.

Q. Do you recall Charles Boblit asking to make a phone call or asking to see a lawyer at this particular time?

A. No.

Q. Did he request to see any members of his family?

MR. BRICE: Objection.

COURT: Overruled.

A. No.

Q. Was the defendant—Charles Boblit placed in the—placed in the cell at any time up to this point?

A. No."

The events at the station between 6:08 and 6:25 of July 2, 1958, although substantially the same as Keissling's version, are best summarized by Agent Hickman, on page 11 of the trial transcript, since, as Corporal Keissling stated, "Hickman was doing most of the talking at that time", P.C. Tr. July at 11:

Q. "Where was Boblit in the vehicle en route to Ferndale?

As to what questioning occurred in the car on the way to the police station, Agent Feeney testified that Boblit gave some background information such as his unemployment, prior arrests "for operating a motor vehicle without a license and [that] he had been confined in Baltimore City jail for approximately 30 days". Boblit also said "that he had been in some trouble over having in his possession a shotgun". P.C. Tr. of June at 67; P.C. Tr. of July at 49. Nowhere in the record does there appear evidence that any statements were taken from Boblit while in the car other than this "background information".

A. Boblit was in the back seat between Cpl. Kiessling and I, and Feeney was driving. We discussed with Mr. Boblit whether he knew Mr. Brady, Mr. John Brady, and we informed him that he had to make no statement and that any statement he made might be used against him in Court, also that he was entitled to have a lawyer represent him.

Q. And that was done before he was interrogated on route?

A. Yes, sir.

Q. Now after being advised as you have indicated, did Boblit make any statement to you concerning his knowledge of John Brady?

A. Yes, he did. At the Ferndale Police Headquarters, I will say just within a matter of five or ten minutes after we arrived there, at the most, Mr. Boblit dropped his head and he told us, 'Well I might as well tell you. You are going to find out anyway.' He proceeded to tell us that he and Brady on the Saturday morning before that, I believe it was June the 28th, that the two of them had driven to a point off of Quarterfield Road near the home of this man, he didn't know his name, he was a man known to Brady, and that they had placed a log across the road, apparently around midnight. After midnight this man came in his 1958 Ford. He was driving back this private road and when he arrived at the log that had been placed across the road, he stopped, got out of the vehicle to remove the log and at that point Brady struck him over the head with a shotgun and that after that the two of them put him in the car, in the back seat of the car, and they drove, they took both cars, both Brady's car and the victim's car,

to Glen Burnie, after which Brady got in and drove the victim's car down Patuxent Road to a point where the victim's body was disposed of. He told us that his shirt, his, Boblit's shirt, was off and when they placed the body in the back seat of the '58 Ford car, his shirt was on the back seat and that when they placed the body in there, Brady took the wallet of the victim prior to the time that they went down to the point where it was disposed of. He said that they drove by way of Glen Burnie and the three, including the victim, drove to a point beyond Odenton. He was unable to tell us exactly where the body could be found and he agreed to direct us to that point.

Q. And after he indicated a willingness to direct you to where the body had been left, did you leave the Ferndale Police Station with Boblit, Mr. Feeney, and Cpl. Kiessling?

A. Yes, we did, and the three of us were again seated in the back, that is Cpl. Kiessling, Mr. Boblit and I."

Keissling testified that after Boblit made these statements he became a suspect. P. C. Tr. of July at 15, 33. At this time no one in the Anne Arundel County Police Department informed Boblit that he had a right to an attorney or to remain silent in addition to those warnings already given Boblit when he was first driven to the Police Station. As indicated in footnote 4, there was no absolute requirement that advice as to rights must be given under the case law of 1959.[7] Further, although there is testimony that Boblit was not desirous of leaving the company of the officers, calling his parents, making a phone call or having an attorney, P. C. Tr. of June at 89, 110, 120; P. C. Tr. of July at 10, it

7. Moreover, although this Court need not decide, under *Miranda* and *Escobedo* it would appear that no warnings were required prior to Boblit's admissions since he was not a suspect or in custody at the time he volunteered these statements.

is clear that not only had Boblit not been arrested prior to his admissions, since the police were under the mistaken impression that Boblit was an innocent witness to Brady's transgression, but also there certainly was probable cause to arrest and detain him after he implicated himself by these statements. Ralph v. Pepersack, 335 F.2d 128 (4 Cir. 1964), cert. denied 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965). See also Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).[8]

After Boblit showed the officers where the body was, they departed the search area and returned to the Police Station at approximately 7:55 p. m. P. C. Tr. of July at 35. Interrogation began at 8:15 p. m. with Boblit writing a statement at around 8:20 p. m. T. T. at 50; P. C. Tr. of June at 110. Thereafter, a more thorough typewritten statement was completed by 12:30 a. m. of July 3, 1958. T. T. at 53; P. C. Tr. June at 110.

On July 3, 1958, petitioner again gave another statement immediately after his arraignment at 10:00 a. m. T. T. at 68, 74; P. C. Tr. of June at 115; P. C. Tr. of July at 26. Petitioner was then, with his consent, taken to Lynchburg, Virginia to look for some evidence Boblit and Brady discarded after the killing. Boblit was returned to Maryland on July 4, 1958, at approximately 2:45 p. m. T. T. at 68. And again on July 5, 1958, from 9:35 a. m. to 10:30 a. m. an additional statement was taken. T. T. at 68; P. C. Tr. of June at 110. However, this questioning was interrupted in order to grant Boblit's first request to use a telephone. P. C. Tr. of June at 110, 119; P. C. Tr. of July at 27. Finally, on July 9, 1958, the last of Boblit's statements was taken in order to clear up some discrepancies between Boblit's and Brady's confessions. In it Boblit admitted for the first time that he struck and later killed Mr. Brooks. However, he would not sign this state-

ment until an attorney read it, although he verbally approved of its contents.[9] As to all these statements, Boblit was advised verbally and in writing on the heading to each statement that "he did not have to make a statement". P. C. Tr. of June at 113. During the trial all the statements were admitted into evidence except the one of July 9, 1958, because the Court felt it unnecessary to risk reversal on apparently the issue of the signature. T. T. at 90.

All the officers involved with these incidents gave substantially the same uncontradicted accounts of these events. Also, each witness that had any meaningful contact with Boblit from July 2, 1958, to July 9, 1958, gave testimony, uncontested by the petitioner, that there were no threats, inducements or promises made at any time during the period. Nowhere is there any testimony that petitioner was subjected to coercive environmental or emotional conditions and Boblit has not made such a claim in any of the petitions filed in this case. As a matter of fact, at the trial Boblit was asked if he was treated "alright before they questioned" him on July 9th and he responded "Yes, sir".

Although it is not always easy to ascertain the state of mind that a person was in on the day he confessed, it is apparent that Boblit knew that the authorities were coming and had no reservations about telling them what happened (T. T. at 116):

A. "I worked Tuesday. I didn't go to work Wednesday, because the man had went to Washington and told me he didn't need me that day. Wednesday, I was sitting home watching television, somewhere about quarter of six, it come over the radio. My sister had turned on the radio in the dining room. I heard where John Leo Brady had give hisself up in

8. Any attempt to attack the confessions as a product of an unconstitutional arrest and detention is foreclosed by this finding that the arrest when made was in accordance with due process.

9. It was this confession that was the withheld evidence that Brady sought in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Havana, Cuba to the American Embassy. Before I could shut the television off my sister had already put the radio on and by the time I got out there it was already over with. About fifteen or twenty minutes later a knock come on the front door, the F.B.I. and Cpl. Kiessling were there. They asked me my name and I told them my name. They come into the house. They asked me could they come in and I let them in. They come into the house. I didn't have any shirt on and I didn't have any shoes on. I went through the front hall into the dining room where the television was. I shut the television off. I went into the dining room to get my shirt and my boots on and they followed me on through, and mother hollered from the kitchen and asked me what it was all about and I told her I didn't know. I got my shirt on, put my boots on and I went outside and got in the car with them and they took me up to Ferndale.

Q. That was July the 2nd?

A. Yes, sir.

Q. Now Donald, when Cpl. Kiessling and the other officers came after you you went with them, is that right?

A. Yes, sir, I did.

Q. Did you cooperate with them?

A. Yes, sir.

Q. Did you put up any struggle at anytime?

A. No, I didn't.

Q. And they took you to Ferndale. Did they ask you any questions on the way to Ferndale?

A. Yes, sir.

Q. Did you give them the answers?

A. Yes, sir.

Q. You have heard the testimony here. You heard that they took you out to the place to locate the body, is that correct?

A. That is correct.

Q. Did you show it to them?

A. That is correct.

Q. And then they took you back to Ferndale, is that correct?

A. That is correct.

Q. That evening, did they interrogate you or question you?

A. Yes, they did.

Q. How long did they question you that night, July the 2nd, now, the day they picked you up?

A. How long I couldn't be too sure, but it was a right good while.

Q. Well you heard the officers say it was from twenty minutes after eight until 12:30. Is that about correct?

A. That is about correct.

Q. And on the following day they took another statement from you, is that correct?

A. That is correct.

Q. Do you remember July the 5th? Is that the day after you came back from Lynchburg, is that correct? They took you down to Lynchburg?

A. Yes, sir.

Q. And on July the 5th, did they take another statement from you?

A. Yes, they did."

Finally, it is noted that petitioner testified at his trial, denying that he killed Mr. Brooks, but admitting his participation in the rest of the well planned crime, including, as follows, his discussions with Brady about how Mr. Brooks would be killed (T. T. at 132):

Q. "That is true isn't it, that you and Brady did discuss killing him after Brady knew he had been recognized?

A. After Brady knew he had been recognized, yes sir.

Q. So that enroute to Patuxent, after this man was lying on the back floor of that car there was considerable discussion between you and

Brady about what to do with him, wasn't there?

A. No, not going down.

Q. After you got there?

A. We were going to tie him up and leave him there.

Q. But you did discuss the necessity of killing him, didn't you?

A. Yes, sir. It did come up.

Q. And wasn't there a conversation between you and Brady as to whether to shoot him or strangle him?

A. I think there was.

Q. You know there was, don't you?

A. There was.

Q. And you wanted to shoot him, didn't you?

A. Yeh, but Brady said strangle him.

Q. Brady said strangle him so you strangled him, right?

A. I did not strangle him.

Duvall—I think that is all, thank you.

(Mr. Turk, redirect examination)

Q. Donald, is there anything else you want to tell the Court about this case?

Duvall—Objection. Improper redirect, too broad, too general.

Court—Sustained. Court sustained the objection. Anything else from this witness.

Turk—That's all."

■ On these facts, petitioner contends, although not specifically stated, that his confession was involuntary. This Court declines to adopt this view and, for the reasons hereinafter stated, finds from an examination of the record, that the confession was " 'made freely, voluntarily, and without compulsion or inducement of any sort.' " Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963).

The testimony in the record is replete with indications of Boblit's willingness to relate to the police the details of the crime. Not only did various officers testify that he was always "very co-operative", but also, according to Hickman's uncontested testimony, Boblit stated, shortly after his arrival at the Police Station, that: "Well I might as well tell you. You are going to find out anyway." This statement, along with Boblit's admissions almost immediately thereafter concerning his knowledge of the location of Mr. Brooks' body, and his cooperative attitude in finding the body, certainly demonstrates that he freely intended to involve himself in the investigation, a not uncommon phenomenon. Outing v. North Carolina, 383 F.2d 892 (4 Cir. 1967), cert. denied, 390 U.S. 997, 88 S.Ct. 1201, 20 L.Ed.2d 96 (1968). Without undue pressure, Boblit turned his admissions into a handwritten confession as soon as he returned to the Police Station after locating the body. There is no evidence that the questioning was in any way improper. The police then quite naturally procured a more readable typed and signed statement thereby completing what amounted to a third confession (one oral and two in writing) freely given by Boblit within a relatively short time after being asked by the authorities if he knew anything about Mr. Brady and the disappearance of Mr. Brooks.[10] Furthermore, an examination of the record makes it quite clear that there is no evidence demonstrating that the later confessions of July 3, 1958, and, July 5, 1958 where in and of themselves taken in violation of Boblit's constitutional rights, and Boblit has not so contended.[11] Additionally, Boblit's candid recital at trial of the numerous confessions during the period between July 2, 1958, and July 9, 1958,

---

10. With this finding, that these confessions, secured by the end of the first day, July 2, 1958, do not offend due process, then any subsequent confession cannot be considered the product of an improperly procured first confession.

11. The confession of July 9, 1958 was not admitted into evidence and, therefore, need not be considered here.

without the slightest recitation of maltreatment, pressure, coercion, broken promises, or inducements is persuasive in reaching the conclusion that these confessions were voluntarily given; and Boblit's continued failure to this day to make allegations to the contrary is consistent with this conclusion.

More important than that which appears in the record, which, as stated above, persuasively shows Boblit's confessions to be "the product of an essentially free and unconstrained choice" *Culombe, supra,* is that which does not appear. Aside from the questioning after the first handwritten confession and the fact he was not immediately taken before a magistrate, the record is barren of evidence which would indicate that his will was overborne and his capacity for self-determination critically impaired. Ralph v. Pepersack, 335 F.2d 128 (4 Cir. 1964), cert. denied, 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965). Although these factors are relevant to the issue of voluntariness, they are by no means controlling. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed. 2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Ralph v. Pepersack, 335 F.2d 128, 140 (4 Cir. 1964), cert. denied, 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965). As stated in *Ralph,* this case does not contain the indicia of a coerced confession found in other cases. For example, nowhere in the record is there a denial of any request by Boblit to contact counsel or friends, cf. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1962); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), nor is there any indication that he was subjected to extensive and relentless interrogation without rest, Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

Further, there is no claim and none appears in the record of subtle psychiatric techniques ever being applied, Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), nor is there a claim or evidence of an extended deprivation of sleep and food or that there was a threat of mob violence, Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). Finally, the instant case does not involve an accused of tender age, Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), or a person of subnormal mental capacity as appears in Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) and Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). In Short, there simply is no reason to deny the State of Maryland the use of these confessions.

Petitioner's third claim that the "States attorney willfully withheld information from proper authorities of Sprin [sic, Spring] Grove State Hospital" is based on a report from that institution wherein it was said that the State's Attorney refused to give to the Hospital Boblit's "police report" and "background information", apparently requested as a matter of routine. P. C. Tr. of June at 39. The report also stated that in refusing to give this information, the State's Attorney directed the Hospital to secure it from Boblit's Attorney. At the Post Conviction of June 25, 1968, one of Boblit's Attorneys, Mr. Turk, stated on page 22:

A.  ". . . And as I recall that in this case the State's Attorney's office had given us cooperation with any information we wanted that was in his file. As a matter of fact, without difficulty I obtained all the statements that Mr. Boblit had given to police. When I say "I", I'm speaking of Mr. Strauss and myself. . . .

Q.  Mr. Turk, do you recall having any medical reports from Spring Grove in the case of Charles Boblit in your possession?

A.  Yes, I think you'll find a copy also in the record. We had petitioned the Court to have Mr. Boblit examined on the grounds of insanity.

The petition itself was signed by Mr. Boblit and filed in the case and we had asked that the State stand the expense which they did and he was, I think, taken to Spring Grove State Hospital for examination. A report was given to the Court, a copy of which was given to us."

Mr. Turk also stated that he talked with one of the doctors who made the diagnosis of Boblit at the Hospital subsequent to their report. No issue of insanity is now or ever has been raised by Boblit.

The leading case on withholding of evidence is Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963) where the State refused to give to Brady Boblit's last confession wherein he admitted the killing. The Court stated:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

■ The contrast between *Brady* and the instant case is patent. Boblit's Attorneys had the information requested by the Hospital; the Hospital could have secured it from them if the doctors so desired. Moreover, Boblit's Attorney conferred with the diagnosing doctor after completion of the report. It can be assumed that the information requested by the Hospital, if material, would have exchanged hands at that time. Finally, since no issue of insanity has been raised, or any claim of a denial of a fair trial or other prejudice proffered, this Court is at a loss to find any deprivation of due process. See Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842, 847 (4 Cir. 1964); Hamric v. Bailey, 386 F.2d 390 (4 Cir. 1967); United States v. Elmore, 423 F.2d 775 (4 Cir. 1970); cert. denied, 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970); United States ex rel. Almeida v. Rundle, 255

F.Supp. 936 (E.D.Pa.1966), aff'd, 383 F.2d 421 (3 Cir. 1967), cert. denied, 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968).

For the reasons stated this petition is Dismissed.

Leave to file in forma pauperis has heretofore been granted.